## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANN M. PANNETTA

              **Plaintiff**

    **v.**

MILFORD CHRYSLER SALES INC.,
FIRST NATIONAL BANK, MEMBERS
ONLY AUTOMOTIVE, JANE DOE, and
JOHN DOE

          **Defendants**

**CIVIL ACTION
NO. 14-05680**

PAPPERT, J.                                                                                MARCH 23, 2015

## MEMORADUM

      Plaintiff Ann Pannetta ("Pannetta") alleges that she was lured into a car dealership through a classic "bait and switch" tactic and then duped into buying a car that was unaffordable and had undisclosed frame damage.  She asserts a federal cause of action for violation of the Truth In Lending Act ("TILA"), and supplemental state law claims for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), fraud, negligence, and negligent misrepresentation against Defendants First National Bank of Pennsylvania ("FNB"), Milford Chrysler Sales, Inc. ("Milford"), and Members Only Automotive ("MOA").  Milford and FNB move to dismiss the First Amended Complaint ("FAC", Doc. No. 10) for failure to state a claim upon which relief can be granted.  The Court grants FNB's motion. Milford's motion is granted in part and denied in part.

**Factual and Procedural Background**

      The events giving rise to this suit began when Pannetta received a mail solicitation from Milford and MOA.  (FAC ¶ 14.)  The solicitation stated that Pannetta could "win a new car." (*Id.* Ex. A.)  It invited her to go to Milford to try a key that was attached to the mailer.  (*Id.* Ex. A.)  A

scratch off area of the solicitation revealed that Pannetta was a "winner" of one of several listed prizes "valued at up to $1000." (*Id.*)

Pannetta drove her car, a 2008 Suzuki, to Milford to see what she had won. (*Id*. ¶ 15.) Upon arriving, Pannetta was greeted by Defendants Jane and John Doe, MOA employees acting as sales agents for Milford. (*Id*. ¶¶ 9, 10, 16.) Jane and John Doe ignored Pannetta's questions about the advertised prizes and convinced her to consider buying a car. (*Id*. ¶ 19.) They showed Pannetta a used 2011 Volkswagen Tiguan (the "Volkswagen"), which would cost her approximately $350 per month. (*Id*. ¶¶ 21, 23.) Pannetta said that she could not afford that payment because she only had $100 of disposable monthly income. (*Id*. ¶¶ 20, 24.)

John Doe proposed a solution. Milford would pay Pannetta $5,600 for her Suzuki. (*Id*. ¶¶ 25.) Pannetta could use those funds to pay off her credit card debt and help with the monthly payments on the Volkswagen. (*Id*.) After ten months, she could return to Milford to refinance the balance of the loan. (*Id*.) John and Jane Doe then turned Pannetta over to a Milford employee. (*Id*. ¶ 28.)

Pannetta was shown a Retail Installment Sales Contract ("RISC") reflecting the financing arrangement for the purchase of the Volkswagen. (*Id*. Ex. B.) The itemization of the amount financed on the RISC showed a $5,600 gross trade-in allowance for Pannetta's Suzuki. (*Id*.) This allowance was reduced, however, by the $5,600 payment made to Pannetta by Milford. (*Id*.) Therefore, Pannetta's trade-in did not reduce the $22,777.01 purchase price of the Volkswagen listed on the RISC. (*Id*.) Milford, however, did reduce the purchase price of the Volkswagen on the Pennsylvania MV-4ST form for purposes of calculating the amount of sales tax due to the Commonwealth. (*Id*. ¶ 37.) With the addition of other itemized fees, the RISC listed the total sale price of the Volkswagen as $26,008.01. (*Id*. Ex. B.)

The TILA disclosure on the RISC listed the full sale price of $26,008.01 as the amount financed.  (*Id.*)  It showed an annual percentage rate ("APR") of 5.74%, a finance charge of $5,710.39, and a total of payments of $31,718.40.  (*Id.*)  This amount was to be paid in 84 monthly installments of $377.60.  (*Id.*)  Pannetta signed the RISC and drove away in the Volkswagen.  (*Id.* ¶ 30.)

Pannetta, concerned over the affordability of the monthly payments, returned to Milford later that day.  (*Id.* ¶ 32.)  She spoke with Milford General Manager John Fournier ("Fournier").  (*Id.* ¶ 33.)  Fournier told Pannetta that she would not be able to refinance the Volkswagen and would have to find a way to keep up with her payments.  (*Id.*)  When Pannetta informed Fournier that Jane and John Doe had told her that she would be able to refinance, Fournier replied that Milford had never made such a promise before and if Pannetta could not afford her monthly payments, she should not have signed the RISC.  (*Id.* ¶ 34.)  Pannetta received a $5,600 check from Milford the next day.  (*See id.* Ex. C.)  Milford later assigned the RISC to FNB.  (*Id.* ¶ 36.)

Pannetta subsequently discovered that the Volkswagen had frame damage that Milford had not disclosed at the time of the sale.  (*Id.* ¶ 62.)  This damage was evident from a 3/8" gap and offset between the front and rear right side doors and should have been easily identifiable to anyone experienced in automobile sales.  (*Id.* ¶¶ 64, 66.)  Because of the undisclosed damage, the Volkswagen's retail value is substantially less than what Pannetta paid for it, and Pannetta would not have purchased the Volkswagen if she knew that it had frame damage.  (*Id.* ¶¶ 65, 67.)

**Legal Standard**

A Rule 12(b)(6) motion tests the sufficiency of the factual allegations in the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  When confronted with a 12(b)(6) motion, a district court must conduct a two-step analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210

(3d Cir. 2009).  First, the district court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210-11.  Then, it "must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  When making this determination, the court can consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record."  *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  The district court must "construe the complaint in the light most favorable to the plaintiff . . . ."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

**Discussion**

<u>The Truth In Lending Act</u>

Pannetta alleges that both Milford and FNB violated the TILA because the RISC should have reduced the cash price of the Volkswagen to the extent the $5,600 paid for Pannetta's Suzuki was paid to Pannetta to pay down the loan.  (FAC ¶ 76.)  Pannetta contends that this failure to reduce the purchase price of the Volkswagen caused a misstatement of the APR and finance charge on the RISC.  (*Id.* ¶¶ 42, 44.)

The TILA regulates "the relationship between lenders and consumers . . . by requiring certain disclosures regarding loan terms and arrangements."  *McCutcheon v. America's Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009); *see also Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 198 (2011) ("Congress passed TILA to promote consumers' informed use of credit by requiring meaningful disclosure of credit terms . . . .").  12 C.F.R. § 226, known as Regulation Z, implements the TILA.  In relevant part, the TILA and Regulation Z require that creditors disclose the amount financed, the finance charge, and the APR applicable to the consumer credit

4

transaction at issue.  *See* 15 U.S.C. § 1638.  The adequacy of a creditor's disclosures is judged under an objective standard that does not take account of the sophistication of the particular borrower asserting the TILA claim.  *Williams v. Empire Funding Corp.*, 109 F. Supp. 2d 352, 357 (E.D. Pa. 2000).  The TILA "should be construed liberally in favor of the consumer." *Rossman v. Fleet Bank (R.I.) Nat. Ass'n*, 280 F.3d 384, 394 (3d Cir. 2002) (quotation omitted).

<u>Pannetta's TILA Claim against First National Bank of Pennsylvania (Count I)</u>

As Pannetta has voluntarily withdrawn her state law claims against FNB, the only claim remaining against FNB is for violation of the TILA (Count I).  (*See* Resp. in Opp'n to FNB Mot. at 5, Doc. No. 16.)  The FAC, however, fails to state a claim against FNB for violation of the TILA.  "TILA imposes assignee liability only if a violation is 'apparent on the face of the disclosure statement.'"  *Ramadan v. Chase Manhattan Corp.*, 229 F.3d 194, 197 (3d Cir. 2000) (quoting 15 U.S.C. § 1641(a)).  In other words, assignee liability is appropriate only where the disclosure "can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned."  15 U.S.C. § 1641(a).

Pannetta does not allege a violation that is apparent from the face of the disclosure statement.  Rather, Pannetta alleges that the value of her trade-in **should have** reduced the purchase price of the Volkswagen.  (FAC ¶ 76.)  On the disclosure statement, the trade-in value **did not** reduce the purchase price because it was completely offset by the payment made to Pannetta by Milford.  There is nothing on the face of the disclosure to alert FNB that this payment was a "fictitious payoff" or "fabricated by Milford" as Pannetta alleges.  (*Id.*)  The disclosure statement speaks for itself and conclusively shows that there is no TILA violation apparent on its face.

Pannetta argues that the facial defect on the disclosure is that it listed a $5,600 "Pay Off Made By Seller" but did not state to whom this payoff was made. Regulation Z requires that the itemization of the amount financed include the names of persons to whom amounts are paid by the creditor on the consumer's behalf. 12 C.F.R. § 226.18(c). In this case, those charges are included in line 4 of the itemization. There was no requirement to identify to whom the $5,600 payment was made, however, because it was made to Pannetta directly. *See id.*

Pannetta also argues that the TILA violation is obvious because the purchase price of the Volkswagen was reduced by the $5,600 trade-in on the MV-4ST form used to calculate the sales tax for the transaction. (FAC ¶ 37.) This argument, however, necessarily looks beyond the disclosure form, and therefore cannot form the basis of a TILA claim against FNB. *See Ramadan*, 229 F.3d at 199 ("That Congress meant to exclude resort to outside documents in defining assignee liability under TILA is clear both from the changes Congress made in its 1980 amendments to § 1641(a) and from the subsequent addition of a related subsection.").

Finally, Pannetta argues that for purposes of deciding a motion to dismiss, the Court must accept as true Pannetta's allegation that the $5,600 was a down payment that should have reduced the purchase price of the Volkswagen. As described above, however, FNB's TILA liability must be based on the contents of the disclosure statement. Pannetta cannot create a factual dispute simply by contradicting what appears on the face of the disclosure. *See ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n.8 (3d Cir. 1994) ("Where there is a disparity between a written instrument annexed to a pleading and an allegation in the pleading based thereon, the written instrument will control."); *see also  N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998) ("It is a well-settled rule that when a written instrument

contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").

Leave to Amend

"[I]f a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile." *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004); *see also Phillips*, 515 F.3d at 236. Here, amendment would be futile. For FNB to be liable, any TILA violation must be evident from the face of the RISC. The RISC, which Pannetta attached to the FAC as Exhibit B, conclusively shows that there is no TILA violation evident on its face. Further amendment would do nothing to change what appears on the face of the RISC. Pannetta's TILA claim against FNB is accordingly dismissed with prejudice.

Pannetta's TILA Claim against Milford Chrysler Sales, Inc. (Count I)

Unlike an evaluation of Pannetta's TILA claim against FNB as assignee, evaluation of Pannetta's TILA claim against Milford, as the creditor, is not limited to the face of the disclosure. *See Ramadan*, 229 F.3d at 199. Pannetta predicates her TILA claim against Milford on the alleged mischaracterization of the $5,600 "payoff" made to Pannetta. (FAC ¶ 39.) She alleges that Milford paid this money to Pannetta with the understanding that at least a portion of it was to be used to pay down the purchase price of the Volkswagen. (*Id.* ¶ 25.) She also contends that Milford used this financing arrangement to make the Volkswagen "affordable in the short term given [Pannetta's] fixed income." (Resp. in Opp'n to Milford Mot. ¶ 9, Doc. No. 14.) She further alleges that Milford's failure to properly characterize the $5,600 as a down payment resulted in an overstatement of the amount financed, finance charge, and APR on the disclosure

statement.  (FAC ¶¶ 42, 44.)  Taken as true and construed in a light most favorable to Pannetta, these facts state a plausible claim that Milford violated the TILA.

Under the TILA, the amount financed is calculated in relevant part by "tak[ing] the principal amount of the loan or the cash price less down payment and trade-in."  15 U.S.C. § 1638 (a)(2)(A)(i).  Regulation Z defines "downpayment" as "an amount, including the value of property used as a trade-in, paid to a seller to reduce the cash price of goods or services purchased in a credit sale transaction."  12 C.F.R. § 226.2(a)(18).  The "downpayment" is not limited to amounts paid at the time of the transaction.  It can also include deferred payments that the consumer is obligated to pay to the creditor to reduce the cash price of the goods sold.  *See* 12 C.F.R. § 226.2.

Here, it is undisputed that Milford gave Pannetta a check for $5,600 in exchange for her Suzuki.  (*See* FAC ¶ 37.)  Pannetta, however, alleges that Milford paid her the $5,600 with an understanding that she would use at least some portion of that payment to pay down her loan.  (*Id*. ¶ 25.)  She alleges that the "pay off" amount listed on the RISC should not have included that portion of the funds she was obligated to pay toward the loan, with a corresponding reduction in the amount financed.  (*See id.* ¶¶ 39, 42.)  Accepting these allegations as true and construing them in the light most favorable to Pannetta, it is plausible that at least a portion of the $5,600 could have met the TILA definition of a down payment, and failing to reduce the amount financed to that extent would have resulted in a faulty disclosure.  As a result, the Court finds that the FAC states a plausible claim against Milford for violation of the TILA.  Milford's motion to dismiss Count I is denied.

Pannetta's Supplemental State Law Claims against Milford

Pannetta brings supplemental state law claims against Milford for fraud (Count II), violation of the UTPCPL (Count III), negligence (Count IV), and negligent misrepresentation (Count V). Milford moves to dismiss all of Pannetta's state law claims for failure to state a claim upon which relief can be granted.

1.  Fraud (Count II)

Pannetta alleges that Milford committed fraud by making misrepresentations about the Volkswagen's affordability, the lawfulness of the RISC paperwork, and the Volkswagen's condition. (*See* FAC ¶ 81.) To state a claim for fraud under Pennsylvania law, Pannetta must plead facts sufficient to show (i) a representation; (ii) which is material; (iii) which was made falsely, either knowingly or recklessly; (iv) with intent to mislead another into relying on it; (v) justifiable reliance; and (vi) resulting injury. *See Heffler v. Joe Bells Auto Serv.*, 946 F. Supp. 348, 353 (E.D. Pa. 1996). Milford argues that Pannetta cannot base her fraud claim on any statement made by Milford regarding the lawfulness of the RISC paperwork or the Volkswagen's affordability.[1] (Milford Mot. to Dismiss at 7-8, Doc. No. 12.)

First, Milford contends that any statement about the lawfulness of the RISC paperwork is not an actionable statement of fact, but rather a "conclusion of law [that] must be disregarded." (Milford Mot. to Dismiss at 7.) Milford's argument confuses the standard used by this Court when evaluating a complaint under a Rule 12(b)(6) motion with the elements of fraud under Pennsylvania law. It is true that this Court need not credit legal conclusions in the FAC when evaluating whether it states a claim. *Fowler*, 578 F.3d at 210-11. Therefore, the Court can disregard Pannetta's legal conclusion that the RISC paperwork was not completed lawfully.

---

[1] Milford does not challenge Panetta's fraud claim to the extent it is premised on statements made about the Volkswagen's condition.

Nevertheless, the Court must accept as true Pannetta's factual allegation that Milford "represented to [Pannetta] that . . . the paperwork for the transaction was completed lawfully . . . ." (FAC ¶ 81.) Moreover, a fraudulent misrepresentation of law is actionable in certain contexts under Pennsylvania law. *See In re Gillingham*, 143 B.R. 55, 61 (Bankr. E.D. Pa. 1992) ("One who fraudulently makes a misrepresentation of fact or law for the purpose of inducing another to act or to refrain from acting in reliance thereon in a business transaction is liable to the other for the harm caused him by justifiably relying thereon."). Milford's motion on this point is therefore denied.

Similarly, Milford contends that any statement about the Volkswagen's affordability is an "opinion or individual judgment," not actionable fact. But, like a misrepresentation of law, a misrepresentation of opinion is actionable under Pennsylvania law in the context of a business transaction. *Jairett v. First Montauk Sec. Corp.*, 203 F.R.D. 181, 185 (E.D. Pa. 2001) ("[A] misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from acting in reliance thereon in a business transaction constitutes actionable fraud.") (quotation omitted). Importantly, Pannetta does not simply allege that Milford stated an opinion that later turned out to be incorrect. Rather, she alleges that Milford knew the Volkswagen was unaffordable yet told her differently. (*See* FAC ¶¶ 39, 83.) These facts state a plausible claim for fraud under Pennsylvania law. *See Neuman v. Corn Exch. Nat. Bank & Trust Co.*, 51 A.2d 759, 764 (Pa. 1947) ("The maker's knowledge of the falsity of the representation fundamentally supplies the element of fraudulent utterance required to make a misrepresentation actionable.").

2. Violation of the UTPCPL (Count III)

Pannetta alleges that Milford's misrepresentations and omissions regarding the Volkswagen's affordability, the lawfulness of the RISC paperwork, and the Volkswagen's

condition also violated the UTPCPL.  (FAC ¶ 98.)  She brings her UTPCPL claim, in part, under § 201–2(4)(xxi), known as the "catchall provision."  The catchall provision prohibits businesses from "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 P.S. § 201–2(4)(xxi).  Milford contends that Pannetta cannot show justifiable reliance on statements regarding the Volkswagen's affordability, because such statements are opinions and judgments.[2]  (Milford Mot. to Dismiss at 9.)  Pannetta believes that she does not need to prove justifiable reliance to make out a claim for a violation of § 201–2(4)(xxi) of the UTPCPL.

Pannetta is incorrect.  It is true that the Pennsylvania Superior Court has stated that a claim under the catchall provision of the UTPCPL does not require proof of the elements of common law fraud.  *See Bennett v. A.T. Masterpiece Homes at Broadspring, LLC*, 40 A.3d 145, 154 (Pa. Super. Ct. 2012).  This Court, however, is not bound by the Superior Court's determination, and the Pennsylvania Supreme Court has not yet adopted a similar view.  *See Conn. Mut. Life Ins. Co. v. Wyman*, 718 F.2d 63, 65 (3d Cir. 1983) ("When ascertaining matters of state law, the decisions of the state's highest court constitute the authoritative source.").  The Court, therefore, will not relieve Pannetta of her burden of pleading facts sufficient to show justifiable reliance.  *See Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 224 (3d Cir. 2008) ("[W]e conclude that private plaintiffs alleging deceptive conduct under the [UTPCPL's] catchall provision must allege justifiable reliance.").

The Court, however, does not find that Pannetta's claim that she justifiably relied on statements about the Volkswagen's affordability fails as a matter of law.  As explained above, in certain contexts, a statement of opinion can form the basis for a fraud claim under Pennsylvania

---

[2]      Once again, Milford does not challenge Panetta's UTPCPL claim to the extent it is premised on statements made about the Volkswagen's condition.

law.  Furthermore, the question of whether Pannetta's reliance on the statements about the

Volkswagen's affordability was reasonable is better resolved by a jury than by this Court.  *See*

*Tran v. Metro. Life Ins. Co.*, 408 F.3d 130, 139 (3d Cir. 2005) ("We stress, as have the

Pennsylvania courts, that the issue of whether reliance on a representation is reasonable (or

justifiable) is generally a question of fact that should be presented to the jury.")  Milford's

motion to dismiss Pannetta's UTPCPL claim is denied.

  3.  Negligence (Count IV)

    Pannetta alleges that Milford's conduct was negligent in numerous respects.  (FAC ¶

107.)  Milford argues that Pannetta's negligence claim is barred by the economic loss doctrine.

(Milford Mot. to Dismiss at 10.)  Pennsylvania's economic loss doctrine precludes recovery for

negligence "if the plaintiff suffers a loss that is exclusively economic, unaccompanied by an

injury to either property or person."  *Bouriez v. Carnegie Mellon Univ.*, 430 Fed. App'x 182, 187

(3d Cir. 2011).  Pannetta alleges damages for the loss of her trade-in and a reduction in the retail

value of the Volkswagen due to the undisclosed damage.  (FAC ¶¶ 65, 108.)  Pannetta does not

allege any injury to property or person.  Consequently, the economic loss doctrine bars her

negligence claim, and that claim is dismissed.

  4.  Negligent Misrepresentation (Count V)

    In the alternative to her fraud and UTPCPL claims, Pannetta alleges that Milford's

statements about the terms and conditions of the sale and the condition and safety of the

Volkswagen were negligent misrepresentations.  Milford argues that the economic loss doctrine

bars this claim as well.  Pannetta responds by citing cases for the proposition that "[t]he

economic loss doctrine does not bar a claim for negligent misrepresentation in Pennsylvania."

(Resp. in Opp'n to Milford Mot. ¶ 41.)

While Pennsylvania has carved out an exception to the economic loss doctrine for claims of negligent misrepresentation, it has done so only for claims made pursuant to Section 552 of the Restatement (Second) of Torts.  *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 285 (Pa. 2005).  Section 552 "sets forth the parameters of a duty owed when one supplies information to others, for one's own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities."  *Bilt-Rite*, 866 A.2d at 285-86.  In other words, the section applies to "professional information provider[s]."  *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 843 (Pa. 2009).

Pannetta does not allege facts sufficient to show that Milford is in the business of supplying information for pecuniary gain.  At best, Milford provided information to Pannetta ancillary to the sale of the Volkswagen.  Such allegations, however, are insufficient to bring Pannetta's claims within the "narrow exception" to the economic loss doctrine.  *Id.* at 842.  Pannetta's negligent misrepresentation claim is therefore dismissed.

<u>Leave to Amend</u>

Amendment would be futile with regard to Pannetta's negligence and negligent misrepresentation claims against Milford.  Pannetta admits that her damages are purely economic.  (Resp. in Opp'n to Milford Mot. ¶ 40.)  As a result, the economic loss doctrine bars those claims, and no additional factual allegations can cure that defect.  Pannetta's negligence and negligent misrepresentation claims against Milford are dismissed with prejudice.

<u>Milford's Motion to Strike Impertinent Material</u>

Milford asks the Court to strike paragraphs 45 through 49 of the FAC as impertinent. (Milford Mot. to Dismiss ¶¶ 43-45.)  Rule 12(f) of the Federal Rules of Civil Procedure allows a party to move to strike from a pleading any redundant, immaterial, impertinent, or scandalous

matter.  "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters."  *McInerney v. Moyer Lumber and Hardware, Inc.*, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002).  Such motions are "appropriately used to remove material that is improper, as a matter of law, and that would prejudice other parties."  *Barrett v. City of Allentown*, 152 F.R.D. 50, 53 (E.D. Pa. 1993).

Here, the allegations in paragraphs 45 through 49 describe a consent decree entered into by Milford and the Pennsylvania Department of Banking regarding alleged violations of Pennsylvania's Motor Vehicle Sales Finance Act.  Pannetta does not allege, however, that the consent decree is in any way connected to her transaction with Milford.  These allegations are irrelevant to Pannetta's claims and are presumably included only to cast Milford in a negative light.  Consequently, paragraphs 45 through 49 are stricken from the FAC.[3]

An appropriate order follows.

   /s/ Gerald J. Pappert
GERALD J. PAPPERT, J.

---

[3]         The FAC contains two paragraphs number "49," both of which are stricken.